UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

MICHAEL POSTAR,

      Plaintiff,

v.                                                            No. 5:24-CV-019-H

GAVIN HYLAND, et al.,

      Defendants.

**MEMORANDUM OPINION AND ORDER**

In 2017, twin brothers Michael and David Postar split their interests in Affordable

Storage, a self-storage business that they jointly owned and operated for many years. As

part of the split, the brothers assigned certain registered trademarks associated with the

business to a holding company in which they both own a 50% stake. Michael has exclusive

rights to use those marks in Lubbock County, whereas David has exclusive rights to use

them in Tom Green and Midland Counties. Years after the split, David, through his

company Gargoyle Management, Inc., licensed a derivative of one of the marks to the

brothers' former employee, Gavin Hyland. Hyland and his wife operate their own self-

storage business, Slaton Affordable Storage, Inc. Their two locations—one of which is in

Lubbock County—are also named Affordable Storage.

Michael sued the Hylands, David, and their companies for, among other things,

trademark infringement, unfair competition, common-law misappropriation, and civil

conspiracy. Generally, Michael alleges that the defendants are violating federal and state

law by using unauthorized derivatives of the Affordable Storage IP to compete against

Michael in Lubbock County. Besides his substantive claims, Michael requests injunctive

relief and a declaratory judgment voiding Hyland's license agreement and finding that the brothers' holding company is the sole owner of the registered marks at issue.

The defendants moved for summary judgment on all claims. Dkt. Nos. 47; 49. The Hyland defendants also moved to exclude the expert testimony of John M. Cone, a lawyer specializing in trademark law. Dkt. No. 51.

The Court grants in part and denies in part the summary-judgment motions. Because Michael does not own the registered marks at issue, he lacks statutory standing to sue for trademark infringement under the Lanham Act. And there is no dispute that the brothers' holding company owns the registered marks. Accordingly, the defendants are entitled to summary judgment on the trademark-infringement claim and to partial summary judgment on Michael's claim for declaratory relief. But genuine issues of material fact remain for the other claims. As a result, the Court denies Michael's request for preliminary injunctive relief.

Lastly, the Court denies the Hyland defendants' motion to exclude Cone's expert testimony. They assert that the opinions in Cone's expert report are impermissible legal conclusions, but the Court needs more context to know for sure. The motion (which looks to effectively exclude all of Cone's possible testimony) is, at this stage, premature.

## 1.    Factual and Procedural Background

### A.    Factual Background

#### i.    The Postar brothers—along with Gavin Hyland and his business, Slaton Affordable Storage, Inc.—build a self-storage empire.

Michael Postar and his twin brother David used to jointly own a self-storage business with locations throughout West Texas. Dkt. No. 49-2 at 3, 5. Their business went by the name "Affordable Storage" and featured, as a logo, a yellow smiley face. *Id.* at 4; *see* Dkt.

No. 50 at 51–60. By all accounts, the business was successful. Through "constant innovation and creativity," Michael and David developed Affordable Storage facilities in Lubbock, Midland, and San Angelo. Dkt. Nos. 49-2 at 5; 59-1 ¶ 2.

Gavin Hyland began working for the Postar brothers in the early 2000s. Dkt. No. 49-2 at 5. A specialist in storage construction, Hyland was a "key employee" who later earned an ownership interest in two of the brothers' storage facilities. *Id.* On top of these ownership interests, Hyland and his wife Myranda started their own self-storage business, Slaton Affordable Storage, Inc. (SAS). Dkt. No. 50 at 4 ¶ 1. In 2011, SAS opened its first location in Slaton, Texas—which is in Lubbock County—using the Affordable Storage name and a yellow smiley face. *Id.* ¶ 2. SAS has used the same name and logo since. *Id.*

In 2013, SAS opened its second location in Brownfield, Texas. *Id.* ¶ 3. As with the Slaton location, SAS branded the Brownfield facility with the Affordable Storage name and the smiley face logo. *Id.* And, again, SAS has used the same name and logo since opening the facility. *Id.* Images of both locations are included below. *See* Dkt. No. 50 at 12, 13.




**Slaton**                    **Brownfield**

According to David, the Postar brothers were supportive of the Hylands' business, despite not owning it. Dkt. No. 49-2 at 5. They did not view SAS as competition, noting that potential customers were unlikely to drive to Slaton or Brownfield when they had

Affordable Storage options closer to home.  *Id.*  Indeed, the brothers encouraged Gavin to use the Affordable Storage name and smiley face logo.  *Id.*

Michael and David were so supportive of SAS, in fact, that they included the Slaton and Brownfield locations in their own Affordable Storage advertising.  *Id.* at 6.  From 2013 through 2017, the brothers listed the SAS facilities in their phone book advertising without any indication that they were separately owned.  *See id.* at 6, 11–24.  To the contrary, several ads suggested that all Affordable Storage locations are "Under Same Ownership."  *Id.* at 16, 20.  During the same approximate period, the brothers also included the SAS locations on their websites.  *See, e.g., id.* at 49–52.

Michael did not take issue with SAS using the Affordable Storage brand during this time.  In his deposition, Michael acknowledged that he knew SAS was using the Affordable Storage name and smiley face logo as early as 2011 and that he first objected to SAS's branding in 2020 or 2021.  *See* Dkt. No. 89 at 8, 12.  Also, six years after the Hylands opened the Slaton location, Michael told Myranda in a recorded phone call that "[Y]'all can use the name.  Anybody can use the name affordable storage, if you wanted to.  'Cus there's a whole bunch of them out there.  You also have the rights to use a regular smiley face. Anybody can use a regular smiley face."  Dkt. Nos. 50 at 42; 53.

### ii.    The Trademark Office registers the Affordable Storage marks.

In early 2017, the Postar brothers filed federal trademark applications related to the Affordable Storage business with the United States Patent and Trademark Office.  Dkt. Nos. 49-2 at 4; 59-1 ¶ 3.  The Trademark Office registered seven marks on behalf of Michael's corporation.  *See* Dkt. No. 49-2.  Two of those marks—the Affordable Storage Logo and the Crown Logo—are relevant here.  *See* Dkt. No. 35 at 17, 19 (the Registered Marks).



**Affordable Storage Logo**                 **Crown Logo**

The registrations for these marks note that "[n]o claim is made to the exclusive right to use" the phrase "AFFORDABLE STORAGE" apart from the registered mark. *Id.*

The Trademark Office granted incontestability status for the Registered Marks in 2023. Dkt. No. 62-4 at 5–6. When a trademark is deemed incontestable under 15 U.S.C. § 1065, "the registration constitutes 'conclusive evidence' of the registrant's right to use the mark," subject to certain enumerated exceptions in 15 U.S.C. § 1115(b). *Tex. Pig Stands, Inc. v. Hard Rock Cafe Int'l, Inc.*, 951 F.2d 684, 690 (5th Cir. 1992) (quoting *Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1184 (5th Cir. 1980)). These exceptions include "equitable principles" such as "laches, estoppel, and acquiescence." 15 U.S.C. § 1115(b)(9).

### iii.    Michael and David split their business interests.

Around the same time they filed their federal trademark applications, the Postar brothers decided to split their business interests through a Mediated Settlement Agreement (MSA). *See* Dkt. No. 59-2. As part of the settlement, an intellectual property holding company—Postar IP, LLC—was formed to hold the Registered Marks. *See* Dkt. No. 59-1 ¶ 7. Accordingly, Michael assigned to Postar IP his corporation's rights in the Registered Marks. *Id.*; *see* Dkt. No. 50 at 32–37. Postar IP thus owns the Registered Marks in full.

Under Postar IP's Company Agreement, the brothers both own 50 percent of the company.[1] Dkt. No. 50 at 31. The Company Agreement—alongside the MSA—dictates

---

[1] Besides David, none of the defendants here are parties to the Postar IP Company Agreement.

how the brothers can use the Affordable Storage brand. *Id.* at 17–18; Dkt. No. 59-2 at 24. Michael has the exclusive right to use the Registered Marks held by Postar IP in Lubbock County, Texas. Dkt. No. 50 at 17. David has the exclusive right to use the Registered Marks held by Postar IP in Tom Green and Midland Counties, Texas. *Id.* Outside those counties, the brothers share universal rights to the Registered Marks. *Id.*; *see* Dkt. No. 59-2 at 24. Neither brother may "assign, convey, sell, encumber or in any way alienate . . . all or any part of his" interest in Postar IP without the prior written consent of the other brother. Dkt. No. 50 at 25–26.

The Company Agreement also sets out decision-making and dispute-resolution procedures. A unanimous-consent provision states that "[n]o act may be taken, sum expended, decision made, or obligation incurred by" Postar IP except by the agreement of both brothers. *Id.* at 21; *see id.* at 19 (noting that neither Michael nor David, "acting alone, has any authority to act for, or to undertake or assume, any obligation, debt, duty or responsibility on behalf of any other [brother] or the Company"). If there is a deadlock, the decision is referred to arbitration. *Id.* at 21; Dkt. No. 59-2 at 7 ¶ 29. Under the MSA and Company Agreement, all arbitration is tasked to Chris Nolland. *Id.* Nolland, "in his sole discretion, will determine the best course of action to be taken." Dkt. No. 50 at 21. That "binding" decision "shall be non-appealable and enforceable by the District Court in which the lawsuit between the [brothers] is pending." Dkt. No. 59-2 at 7 ¶ 29.

### iv. Postar IP executes a First License Agreement that permits the Hylands and SAS to use the Registered Marks for three years.

After the split, Gavin Hyland chose to work exclusively with David. Dkt. No. 87-1 at 12. As part of a deal to buy out Hyland's interest in one of Michael's businesses, Postar IP agreed to license its intellectual property to SAS for the operation and marketing of the

Slaton and Brownfield locations. *See* Dkt. No. 50 at 38–41 (the First License Agreement). An early draft of the First License Agreement barred SAS from using the Affordable Storage name and smiley face signage—the same name and signage that it had used at its Slaton and Brownfield locations since 2011 and 2013—at the conclusion of a three-year term. *See* Dkt. No. 49-2 at 100–05. The Hylands refused to sign. *Id.* at 8 ¶ 13. The final draft removed the restriction, thus limiting the license to the Registered Marks. *See* Dkt. No. 50 at 41. Still, Michael maintains that the First License Agreement was meant to give the Hylands "time to find a new logo or brand for their business." Dkt. No. 58 at 36. That rebranding, Michael suggests, required the Hylands to remove the original Affordable Storage name and signage that was left out of the final Agreement. *See* Dkt. No. 59-9 at 44 ¶ 14. David disputes this interpretation, arguing that Michael "already knew that SAS was going to continue using derivatives of Postar IP when SAS refused to sign the earlier draft of the [First License] Agreement that required SAS to stop using the name Affordable Storage and all smiley face logos" at the conclusion of the licensing term. Dkt. No. 49-1 at 16.

Everyone agrees, however, that the final First License Agreement authorized SAS to use the Registered Marks for a three-year term beginning on August 1, 2018, and ending on July 31, 2021. Dkt. No. 50 at 38. Absent an extension, SAS agreed to immediately stop using the Registered Marks when the license expired. *Id.* Both Michael and David signed the First License Agreement in accordance with Postar IP's Company Agreement. *Id.* at 40.

The Hylands contend that they "completely stopped using any of the trademarks" covered by the First License Agreement on July 31, 2021. Dkt. No. 50 at 6 ¶ 8. Myranda Hyland confirmed to David via email on August 1, 2021, that SAS removed the Registered

Marks as required.  *Id.* at 43.  But SAS continued to use (and still uses today) its original Affordable Storage name and smiley face signage.  *See* Dkt. No. 91-1 at 58, 61–62.

### v. David's company, Gargoyle Management, Inc., enters into a Second License Agreement with Gavin Hyland.

About one month after the First License Agreement expired, Gavin Hyland entered into a Second License Agreement with David's company, Gargoyle Management, Inc.  *See* Dkt. No. 50 at 46–48.  The Second License Agreement granted Hyland a perpetual, non-transferable license to use two trademarks that were not included in the First License Agreement.  The first is a word mark: "Why Pay a Lot for Storage."  *Id.* at 48.  The second is an image of a yellow smiley face with arms, legs, and gloved hands standing next to the phrase "Affordable Self Storage."  *Id.*  Much of this litigation turns on the second mark, shown at right, which the Court refers to as the Licensed Mark.

According to Michael, the Licensed Mark is an unauthorized "derivation" of the Registered Marks that—under the Postar IP Company Agreement—David could not unilaterally license to the Hylands for use in Lubbock County.  *E.g.*, Dkt. No. 58 at 10.  Michael uses the following graphic to support the point:

| First Intellectual Property Agreement (lawful) | Second Trademark License Agreement (unlawful) |
|---|---|
| | |

*Id.* David, for his part, contends that he had authority to authorize the Hylands' use of the Licensed Mark (what he calls "Smiley Character") because it was created by a Gargoyle employee after the brothers' split. Dkt. No. 49-2 at 9 ¶ 17; *see id.* (David: "I never thought Smiley Character was a derivative of Postar IP . . . ."). To add to the confusion, Gavin Hyland represents that the Second License Agreement only licensed trademarks owned by Gargoyle (Dkt. No. 48 at 7) and that there is "no overlap in scope" between the trademarks licensed under the First and Second License Agreements (Dkt. No. 50 at 7 ¶ 9). Even then, Hyland testified at his deposition that he only used the Licensed Mark for six weeks before taking it down at David's request. Dkt. No. 85-1 at 17.

### vi. Michael brings federal and state claims for the defendants' alleged misuse of the Registered Marks.

In 2024, Michael filed this lawsuit, raising federal and state claims for, among other things, trademark infringement, unfair competition, common-law misappropriation, and civil conspiracy. Dkt. No. 1. He twice amended his complaint. *See* Dkt. Nos. 23; 35. Michael's Second Amended Complaint is now the operative pleading. Dkt. No. 35.

Michael's allegations fall into two broad camps. First, Michael alleges that the defendants conspired to employ the Second License Agreement to permit the Hylands' use of the Licensed Mark, an unauthorized derivative of the Registered Marks, in violation of the Postar IP Company Agreement. Dkt. No. 35 ¶¶ 19–21. More specifically, Michael claims that David is using his employee Hyland to compete with Michael in Lubbock County—even though Michael possesses exclusive rights to the Affordable Storage brand in Lubbock, and even though David cannot unilaterally assign Postar IP's rights to the Registered Marks under the Company Agreement. *Id.* Second, Michael alleges that the Hylands and SAS are employing unauthorized derivatives of the Registered Marks by

– 9 –

continuing to use the Affordable Storage name and smiley face signage that has been affixed to the Slaton and Brownfield facilities for 20+ years. *Id.* ¶¶ 24, 34; *see* Dkt. No. 58 at 32.

As for relief, Michael seeks actual damages, punitive damages, lost profits, and disgorgement of the defendants' profits. Dkt. No. 35 ¶ 60. He also requests attorney's fees under 15 U.S.C. § 1117(a), a declaratory judgment that the Second License Agreement is null and void, and a preliminary and/or permanent injunction preventing the Hylands and SAS from using the Registered Marks or their derivations in any self-storage business. *Id.* ¶¶ 45, 53, 63. The defendants raised a limitations defense. Dkt. Nos. 38 at 22; 41 at 14–15.

Before the Court are two motions for summary judgment: one from the Hylands and SAS, and one from David and Gargoyle. Dkt. Nos. 47; 49. Michael responded (Dkt. Nos. 58; 61), and the defendants replied (Dkt. Nos. 64; 65). Also before the Court is the Hyland defendants' motion to strike the expert testimony of John M. Cone, a Plano-based trademark attorney. Dkt. No. 51. Michael responded to that motion, too. Dkt. No. 56.

### B.    Procedural History

This lawsuit involves several long-running disputes surrounding the split-up of the Postar businesses. Over nearly eight years, there has been state and federal litigation, three arbitrations, mediations, and cease-and-desist letters. *See, e.g.*, *Postar v. Postar, et al.*, No. 5:24-CV-022 (N.D. Tex.) (copyright suit); *Postar v. Postar*, 5:24-CV-159 (N.D. Tex.) (another trademark infringement suit); *Postar v. Postar, et al.*, No. 5:24-CV-165, Dkt. No. 28 (N.D. Tex. Mar. 12, 2025) (granting David's motion to remand a different case to the 72nd Judicial District Court for Lubbock County, Texas); Dkt. Nos. 59-4; 59-8 at 1–2; *see also Landmark Am. Ins. Co. v. Gargoyle Mgmt. Inc.*, No. 5:24-CV-038, 2025 WL 576604, at *1

(N.D. Tex. Feb. 14, 2025) (Burch, J.) (noting the brothers' "contentious relationship"). This procedural history, though complicated, is key to understanding the instant litigation.

### i.    First Arbitration

The story begins in April 2018, shortly after the split. Through their attorney, David and Gargoyle sent Michael a cease-and-desist letter alleging that he was improperly using the "Gargoyle Mark" in his self-storage business. Dkt. No. 59-4 at 1–2. The Gargoyle Mark, like the Licensed Mark from the Second License Agreement, featured a "smiley face with arms and legs and gloved hands with thumbs pointing back toward the smiley face." *Id.* at 1. According to David and Gargoyle, the Gargoyle Mark was not part of the Postar IP Company Agreement and thus was not subject to its exclusive-territory provisions. *Id.*

In response, Michael asserted his purported rights to use an anthropomorphic smiley face. *See* Dkt. No. 59-5 at 1–2. And he contested David and Gargoyle' use of the Gargoyle Mark. *Id.* In his counsel's view, "[s]imply taking the Smiley Face and adding arms and legs" is a "mere variation" on the Registered Marks, which Michael has exclusive rights to use in Lubbock County. *Id.* at 2.

Under the MSA, the brothers submitted the dispute over the Gargoyle Mark to Nolland for arbitration.[2] Dkt. No. 59-1 ¶ 11. After a hearing, Nolland issued the First Arbitration Award. *See* Dkt. No. 59-7. What David called the Gargoyle Mark, Nolland called the Smiley Mark. *Id.* at 1. Nolland described the Smiley Mark as "a smiley face character,



---

[2] The first arbitration also involved Michael's own infringement claim based on David's use of a mark consisting of a box with arms and legs (Box Guy) that Michael alleged was confusingly similar to the smiley face character. *See* Dkt. No. 59-5 at 1. That dispute is not relevant here.

typically yellow in color . . . with arms, legs, hands, and feet." *Id.* Exhibit B to the Award, incorporated above, included a visual depiction of the Smiley Mark. *Id.* at 23.

Critically, Nolland concluded that, despite any rights that David may have in the Smiley Mark, "Michael contractually and otherwise has the exclusive rights as between Michael and David to use the Smiley mark or any iterations thereof in Lubbock County, Texas, in connection with the storage business." *Id.* at 9 ¶ 17; *see id.* ¶ 16 (basing this conclusion on "pre-split up activity," the "mediation agreements," and "related documents entered into between Michael and David to effectuate their business split up"). To avoid any doubt, Nolland further clarified that the Smiley Mark and its iterations broadly include "the classic Smiley face, a Smiley face with a crown, a Smiley face with appendages (hands or arms), or the 'Smiley person' (a Smiley face with arms, legs, gloved or un-gloved hands, and feet, etc.), and substantially similar depictions." *Id.* ¶ 17. In other words, Nolland made clear that only Michael can use a smiley face with arms and legs in Lubbock County, even if David technically owns the Smiley Mark and even though David has his own exclusive rights in Tom Green and Midland Counties. *Id.* ¶¶ 17–19.

Moreover, "[f]or purposes of clarity, avoidance of further conflict or disputes, and to forestall and prevent any attempts to 'end run' the rights set forth in [the] Award," Nolland instituted certain "prophylactic measures" with respect to the brothers' Smiley Mark rights. *Id.* ¶ 21. Specifically, David's and Michael's respective rights to the Smiley Mark and its iterations "shall not be licensable or sub-licensable to unrelated third parties." *Id.* And to the extent David obtains legal protections for the Smiley Mark, "any license, sub-license, or transfer thereof by David" must be made "subject to Michael's rights" and with Michael specifically referenced in the documents effectuating any such agreement. *Id.* ¶ 22.

– 12 –

To summarize, years before David, through Gargoyle, licensed the Licensed Mark to Gavin Hyland, a binding arbitral award concluded that Michael had exclusive rights to use the Smiley Mark and its iterations in Lubbock.  Moreover, the First Arbitration Award put strict limits on the brothers' ability to license their respective rights in the Smiley Mark.

### ii.    Second Arbitration, Nolland's Recusal, and Lead-up to the Third Arbitration

About four years after the First Arbitration Award, the brothers fired off another round of accusations pertaining to the use of internet website domain names, among other things.  Dkt. No. 59-8 at 1–2.  After mediation failed, the brothers proceeded to a second arbitration before Nolland.  Dkt. No. 59-1 ¶ 13.  Nolland later issued a Second Arbitration Award, the details of which are not relevant here.  *See* Dkt. No. 59-9 at 1–12.

Some months later, in August 2023, Michael sent a letter to Nolland alleging that David had recently begun "using derivations of the Registered Marks belonging to Postar IP."  *Id.* at 14.  Listed as an example was the Licensed Mark—the yellow smiley face with arms, legs, and gloved hands standing next to the phrase "Affordable Self Storage" that Gargoyle licensed to Gavin Hyland in the Second License Agreement two years prior.  *Id.* Based on these purported developments, as well as the Hylands' alleged "unlicensed use of derivations of the Registered Trademarks held by Postar IP," *id.* at 13, Michael requested a third arbitration to "prevent David from using the derivative marks" or, alternatively, to "require David to transfer the derivative marks to Postar IP."  *Id.* at 16.

Over David's objections, Nolland determined that these issues, among others, were arbitrable under the Company Agreement and MSA.  *Id.* at 31–32.  He set a final arbitration hearing for August 2024.  Dkt. No. 59-16 at 26.

– 13 –

Then things took a turn.  After David's counsel raised for the first time concerns about Nolland's prior participation in unrelated mediations with Michael's counsel, Nolland recused himself as the parties' arbitrator for all current or future disputes, effectively canceling the August 2024 arbitration.  *Id.* at 24 ¶ 6, 37–39.  Thereafter, the brothers could not agree on a single replacement arbitrator.  Dkt. No. 89 at 40 & n.60.  But with the help of the Lubbock County Office of Dispute Resolution, the parties agreed to present the outstanding matters to a panel of three arbitrators.  *Id.* at 39; *Postar v. Postar*, No. 5:24-CV-159, Dkt. No. 35 at 1 (N.D. Tex. June 23, 2025).  The panel held a hearing from September 8–11, 2025.  Dkt. No. 89 at 24.  Although the Hylands and SAS were not parties to the arbitration, their counsel was present during Gavin Hyland's testimony.  *Id.* at 25.

### iii.    Third Arbitration Award

The arbitration panel issued the Third Arbitration Award on November 12, 2025— months after briefing on the defendants' summary-judgment motions was complete.  *See* Dkt. No. 89 at 20–84.  Several of the panel's binding conclusions bear on this litigation.

First, the panel generally addressed the concept of "derivations."  *Id.* at 33–34.  The term "derivation," the panel explained, "is not a term of art in trademark law."  *Id.* at 33.  And despite Michael's repeated claims to the contrary (*see, e.g.*, Dkt. No. 58 ¶¶ 48, 67, 69, 98, 101, 103, 108), the "Postar IP [Company] Agreement . . . makes no mention of derivations."  Dkt. No. 89 at 33.  Nevertheless, based mainly on the testimony of David's trademark expert, the panel concluded that "any 'derivation' (mark that includes one of the Postar IP marks or a variation of one of those marks) is the property of Postar IP."  *Id.* at 34.

With that background, the panel concluded that the Licensed Mark, which "create[s] the same consumer impression" as to the Registered Marks, belongs to Postar IP.  *Id.* at 66.

Thus, "David did not have the authority to license that mark to Mr. Hyland" in the Second License Agreement. *Id.* at 69. Yet the panel did not grant Michael's request to void the Second License Agreement, noting that Gavin Hyland "is no longer using" the Licensed Mark. *Id.* at 68–69. So the Second License Agreement remains in effect.

Lastly, the panel denied Michael's request that it authorize Postar IP to take over this lawsuit against the Hylands. *Id.* at 70. The panel recognized that "Postar IP has a right to stop others from using Postar IP marks even if that use is not causing monetary damage to Postar IP." *Id.* at 71. But it ultimately concluded that "significant factors weigh[] against a lawsuit by Postar IP against Mr. Hyland." *Id.* at 72. For instance, on the panel's view, SAS is not a significant competitor with Michael's Affordable Storage business. *Id.* And by filing this lawsuit without Postar IP's consent, Michael "deprived Postar IP of choices that cannot be corrected simply by Postar IP taking over the lawsuit." *Id.* Accordingly, while the panel "recognize[d] [this] lawsuit may continue," it declined to authorize Postar IP to step into Michael's shoes as the plaintiff. *Id.*

Following the Third Arbitration Award, the Court allowed the parties to supplement the summary-judgment record and their briefing on the motions. *See, e.g.*, Dkt. Nos. 84–91. Both motions for summary judgment are now ripe for review.

## 2.    The Defendants' Motions for Summary Judgment

### A.    Legal Standards

#### i.    Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists if a reasonable jury could

– 15 –

enter a verdict for the non-moving party." *Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 358 (5th Cir. 2020). The moving party "bears the initial responsibility of demonstrating the absence of a genuine issue of material fact," *Jones v. United States*, 936 F.3d 318, 321 (5th Cir. 2019) (internal omission and alteration omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)), and "identifying those portions of [the record] which it believes demonstrate [that] absence." *Celotex Corp.*, 477 U.S. at 323.

In evaluating a summary-judgment motion, the Court draws all reasonable inferences in the light most favorable to the nonmoving party. *Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). "A fact 'is material if its resolution could affect the outcome of the action.'" *Dyer v. Houston*, 964 F.3d 374, 379 (5th Cir. 2020) (quoting *Sierra Club, Inc. v. Sandy Creek Energy Assocs., LP*, 627 F.3d 134, 134 (5th Cir. 2010)). The Court must consider materials cited by the parties, but it may also consider other materials in the record. Fed. R. Civ. P. 56(c)(3).

"Where the nonmovant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 301–02 (5th Cir. 2020) (quoting *In re La. Crawfish Producers*, 852 F.3d 456, 462 (5th Cir. 2017)). The movant, however, does not need to "*negate* the elements of the nonmovant's case." *Austin v. Kroger Tex., LP*, 864 F.3d 326, 335 (5th Cir. 2017) (emphasis in original) (quoting *Little v. Liquid Air*

*Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)). "If the moving party fails to meet [its] initial burden, the motion must be denied, regardless of the nonmovant's response." *Pioneer Expl., LLC v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (quoting *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001)).

When the moving party has met its burden, "the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010). Rather, the nonmovant must identify specific evidence in the record and articulate how the evidence supports its claim. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014); *see also* Fed. R. Civ. P. 56(c)(1)(A). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (quoting *Little*, 37 F.3d at 1075). Additionally, Rule 56 does not impose a duty on the Court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n.7 (5th Cir. 1992)).

"A failure on the part of the nonmoving party to offer proof concerning an essential element of its case necessarily renders all other facts immaterial and mandates a finding that no genuine issue of fact exists." *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment must be granted. *Celotex Corp.*, 477 U.S. at 322–23. "Where the record taken as a whole could not lead a rational trier of fact to find for

the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)).

### ii.    Trademarks

Trademarks help consumers find what they seek while protecting businessowners' investments in their reputations.  S. Rep. No. 79-1333, at 3–4 (1946).  Any "word, name, symbol, or device, or any combination thereof" used "to identify and distinguish" goods in commerce can be a trademark.  *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 475 (5th Cir. 2008) (quoting 15 U.S.C. § 1127).  The common-law rule that "[o]ne who first uses a distinct mark in commerce . . . acquires rights to that mark" holds true today.  *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 142 (2015).  Those rights allow the owner of the mark to prevent the use by others of similar marks on similar goods.  *See, e.g.*, *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 368 (1924).

### a.    The Lanham Act

"Though federal law does not create trademarks, Congress has long played a role in protecting them."  *B & B Hardware*, 575 U.S. at 142 (internal citation omitted).  "The foundation of current federal trademark law is the Lanham Act, enacted in 1946."  *Matal v. Tam*, 582 U.S. 218, 224 (2017); *see* Trademark Act of 1946, ch. 540, 60 Stat. 427 (codified as amended at 15 U.S.C. § 1051 *et seq.*).  The Act has two main functions: First, to "protect the public so it may be confident that, in purchasing a product bearing a particular trade-mark which it favorably knows, it will get the product which it asks for and wants to get."  S. Rep. No. 79-1333, at 3 (1946).  And, second, to "secur[e] to the [trademark] owner the goodwill of his business."  *Id.*  More broadly, the Act "was intended to make 'actionable the

deceptive and misleading use of marks' and 'to protect persons engaged in . . . commerce against unfair competition.'" *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 767–68 (1992) (quoting 15 U.S.C. § 1127).

To those ends, Congress provided causes of action for, among other things, trademark infringement and unfair competition.[3]  *See Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140, 147 (2023).  Section 1114 of Title 15 governs infringement of registered trademarks.  *Cf. U.S. Patent & Trademark Off. v. Booking.com B.V.*, 591 U.S. 549, 552–53 (2020) (outlining the federal trademark registration system and the benefits that accrue to registrants).  Under Section 1114, the owner of a registered trademark may bring a civil action alleging that there is a likelihood of confusing the infringer's mark for the plaintiff's. *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 117–18 (2004).

The Lanham Act's unfair-competition provision, Section 1125(a), "goes beyond trademark protection."  *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 29 (2003).  It broadly covers a "myriad of deceptive commercial practices," including false designation of origin and false advertising.  *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1383 (5th Cir. 1996) (quoting *Res. Devs. v. Statue of Liberty-Ellis Island Found.*, 926 F.2d 134, 139 (2d Cir. 1991)).  Section 1125(a) also provides an infringement cause of action for unregistered trademarks.  *Matal*, 582 U.S. at 225.  Generally, the likelihood-of-confusion analysis for Section 1114 infringement claims also applies to unfair-competition actions under Section 1125(a).  *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 483 (5th Cir.

---

[3] The Lanham Act also includes a cause of action for the dilution of famous marks—think Dupont, Buick, and Kodiak—which does not require a likelihood of confusion.  *See* 15 U.S.C. § 1125(c); *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 431 (2003).  And a Lanham Act plaintiff may allege infringement of trade dress—the "total image and overall appearance" of a product.  *Two Pesos*, 505 U.S. at 764 n.1 (quoting *Blue Bell Bio-Med. v. Cin-Bad, Inc.*, 864 F.2d 1253, 1256 (5th Cir. 1989)).

2004); *see also Matrix Essentials, Inc. v. Emporium Drug Mart, Inc.*, 988 F.2d 587, 592 (5th Cir. 1993) ("As with trademark infringement, the touchstone of a section 1125(a) unfair competition claim is whether the defendant's actions are 'likely to cause confusion.'").

### b.    State Trademark and Unfair Competition Law

The federal trademark scheme "peacefully co-exist[s]" with intellectual property protections on the state level. 3 McCarthy on Trademarks & Unfair Competition § 22:1 (5th ed. 2025). As in the federal system, markholders may register their trademarks with state authorities. *See Hot-Hed, Inc. v. Safehouse Habitats (Scotland), Ltd.*, 333 S.W.3d 719, 729–30 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (quoting Tex. Bus. & Com. Code Ann. § 16.15(c)). They may also assert common-law rights in unregistered marks. 3 McCarthy on Trademarks § 22:1. State trademark law—often styled as unfair competition—rarely differs from its federal counterpart. *Id.*; *see also United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97 (1918) ("The law of trade-marks is but a part of the broader law of unfair competition; . . . ."). "A trademark infringement and unfair competition action under Texas common law," for example, "presents essentially 'no difference in issues than those under federal trademark infringement actions.'" *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 235 n.7 (5th Cir. 2010) (quoting *Horseshoe Bay Resort Sales Co. v. Lake Lyndon B. Johnson Improvement Corp.*, 53 S.W.3d 799, 806 n.3 (Tex. App.—Austin 2001, pet. denied)).

### B.    Analysis

#### i.    The Court grants summary judgment to the defendants on Michael's trademark-infringement claim under the Lanham Act.

Count One alleges trademark infringement in violation of Section 1114 of the Lanham Act. Dkt. No. 35 ¶¶ 23–26. According to Michael, the Hylands and SAS are using the Registered Marks and their derivations to falsely indicate to consumers that their self-

storage business is associated with the Affordable Storage brand.  *Id.* ¶ 24.  The defendants'
alleged unauthorized use of the Registered Marks—aided by the Second License Agreement
with Gargoyle—is said to cause confusion or to deceive current and potential customers by
suggesting affiliation with Michael or "the original 'Affordable Storage' business."  *Id.* ¶ 25.

"To prevail on [a] claim of trademark infringement under the Lanham Act, [the
claimant] must show two elements: (1) [he] possesses a legally protectable trademark and
(2) [the alleged infringer's] use of this trademark 'creates a likelihood of confusion as to
source, affiliation, or sponsorship.'"  *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851
F.3d 440, 450 (5th Cir. 2017) (quoting *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783
F.3d 527, 536 (5th Cir. 2015)); *see* 15 U.S.C. § 1114(1).  For infringement actions under
Section 1114, there is another "threshold element": "Whether a plaintiff has a sufficient
interest in a mark to sue under the Lanham Act."  *Rex Real Est. I, LP v. Rex Real Est. Exch.,
Inc.*, 80 F.4th 607, 616 (5th Cir. 2023).  This is "a question of statutory standing."[4]  *Id.*

### a.    Michael lacks statutory standing.

Because Michael lacks statutory standing, his trademark-infringement claim fails as a
matter of law.  The cause of action in Section 1114 is available only to "the registrant" of
the trademarks at issue.  *See* 15 U.S.C. § 1127 (defining "registrant" to embrace "the legal
representatives, predecessors, successors and assigns of such . . . registrant").  Under the
Lanham Act, the owner of a trademark is the proper party to apply for registration.  15
U.S.C. § 1051(a)(1) ("The owner of a trademark used in commerce may request registration

---

[4] Statutory standing "does not implicate subject-matter jurisdiction."  *Lexmark Int'l Inc. v. Static
Control Components, Inc.*, 572 U.S. 118, 134 n.4 (2014).  "Instead, it asks the merits question of
whether or not a particular cause of action authorizes an injured plaintiff to sue."  *Simmons v. UBS
Fin. Servs., Inc.*, 972 F.3d 664, 666 (5th Cir. 2020) (internal quotation marks omitted).

of its trademark . . . .").  Thus, the Fifth Circuit has held that "only an owner or a true assignee has statutory standing to bring a claim under [Section 1114]."  *Rex Real Est. I, LP*, 80 F.4th at 616 (citing *Neutron Depot, LLC v. Bankrate, Inc.*, 798 F. App'x 803, 806 (5th Cir. 2020)).  Put another way, if a plaintiff does not "own the [registered] mark outright," then he lacks standing to assert an infringement claim under the statute.  *Neutron Depot, LLC*, 798 F. App'x at 806; *accord Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits Ltd.*, 726 F.3d 62, 72 (2d Cir. 2013).

Michael does not own the Registered Marks.  Recall that Michael's corporation assigned the Registered Marks to Postar IP as part of the brothers' settlement.  Dkt. No. 50 at 32–37.  In doing so, Michael's corporation conveyed to Postar IP "all of [its] right, title and interest of whatever kind" in the Registered Marks, including "all rights to sue for past, present, and future infringements or misappropriations of the Marks."  *Id.* at 34; *see also* 3 McCarthy on Trademarks § 18:1 ("An 'assignment' of a mark is an outright sale of all rights in that mark.").  As Michael concedes, Postar IP thus owns the Registered Marks.  Dkt. No. 58 at 46 ("[A]ll parties agree the Registered Marks are owned by Postar IP . . . .").  So only Postar IP has statutory standing to sue for infringement of the Registered Marks.

Michael's counterarguments are unpersuasive.  For starters, he argues for the first time in his response that he brought this suit "individually and derivatively on behalf of Postar IP."  *Id.* at 23.  To his credit, Michael acknowledges that this theory was "not explicitly stated" in his live pleading.  *Id.*  Indeed, his Second Amended Complaint does not come close to satisfying the requirements for alleging a derivative action under Federal Rule of Civil Procedure 23.1.  As Michael admits, his amended complaint "does not explicitly allege" with particularity any efforts that he made to have David agree to a lawsuit against

– 22 –

the Hylands or the reasons for not doing so.  *Id.*; *see* Fed. R. Civ. P. 23.1(b)(3).  Those flaws are reason enough to discount Michael's effort to recast this suit as a derivative action.

But Michael's attempt to defend Postar IP's rights suffers from more fundamental flaws.  Under the Company Agreement's unanimous-consent provisions, neither brother may act alone on behalf of Postar IP.  *E.g.*, Dkt. No. 50 at 21.  Michael did not obtain David's consent to bring an infringement suit on Postar IP's behalf.  *See* Dkt. No. 58 at 23–24.  Nor did he secure the arbitrator's tie-breaking vote.  *See id.* at 26.  Thus, the Company Agreement bars Michael from unilaterally asserting Postar IP's rights in this lawsuit.

Still, Michael argues that his failure to properly bring a lawsuit on Postar IP's behalf should not pose an obstacle here.  He notes that the Company Agreement is governed by Texas law, *see* Dkt. No. 50 at 29, and that "matters of internal corporate power are in the first instance controlled by state law."  Dkt. No. 58 at 24 (quoting *Clark v. Lomas & Nettleton Fin. Corp.*, 625 F.2d 49, 52 n.3 (5th Cir. 1980)).  On that understanding, Michael identifies two state statutes—Texas Business Organizations Code §§ 101.463 and 101.452(a)(1)(A)—that he says allow the Court to treat this suit as a derivative action "if justice requires."  Dkt. No. 58 at 25–26.  The Court need not elaborate on those statutes here.  Even if the statutes apply, "reasons of equity" (as Michael puts it) do not supersede the Company Agreement's plain text.  *Id.* at 24.  And what constitutes "equity" in this case is far from clear.  There is much water under the bridge, and the Court is not equipped to determine whether either brother is "the mastermind working behind the scenes" to deprive the other sibling of his rights.  *Id.* at 26.

If any doubt remained, the Third Arbitration Award dispels it.  The panel denied Michael's request that it authorize Postar IP to take over this lawsuit.  Dkt. No. 89 at 70.

– 23 –

The panel explained that "significant factors" weighed against a lawsuit by Postar IP, including Gavin Hyland's "long and intertwined relationship" with the brothers and the lawsuit's "potential to be bad press for Postar IP brands." *Id.* at 72. What's more, Michael "deprived Postar IP of choices" by "filing [this] lawsuit without [the company's] approval and counsel." *Id.* As the panel explained, those choices "cannot be corrected simply by Postar IP taking over [this] lawsuit." *Id.* Accordingly, Michael failed to secure the tie-breaking vote to authorize a trademark-infringement suit by the only entity with statutory standing to protect the Registered Marks, and there is little reason to exercise whatever equitable authority the Court has to greenlight a derivative action that Michael did not raise until over a year after he filed this lawsuit.[5] *Compare* Dkt. No. 1, *with* Dkt. No. 58 at 23.

*          *          *

In short, because Michael does not own the Registered Marks, he lacks statutory standing to sue the defendants for allegedly infringing those marks under Section 1114. *See Rex Real Est. I, LP*, 80 F.4th at 616. And Michael's attempt to refashion this individual suit as a derivative action is unavailing. The Court therefore grants summary judgment to the defendants on Michael's trademark-infringement claim.

### ii.    Genuine issues of material fact remain on Michael's other claims.

Although the Court grants the defendants' summary-judgment motions with respect to the trademark-infringement claim, it largely denies the motions as to the remaining

---

[5] For the same reasons, Michael's late-stage request in his summary-judgment response for leave to amend his complaint is too little, too late. Dkt. No. 58 at 23; *see Marucci Sports, LLC v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014) (explaining that reasons to deny leave to amend include undue delay and futility of amendment).

claims.  Drawing all inferences in Michael's favor, *see Darden*, 880 F.3d at 727, there are still genuine issues of material fact on those counts.

### a.    Unfair Competition under the Lanham Act

Count Two alleges unfair competition under Section 1125(a) of the Lanham Act. Dkt. No. 35 ¶¶ 27–32.  Michael contends that the defendants continue to make "false or misleading statements of fact about their connection or association" with the original Affordable Storage business.  *Id.* ¶ 28.  This alleged deception is material, Michael alleges, because it "deceives a substantial segment of potential consumers" and influences their "purchasing decision by suggesting that [the defendants] are themselves the original 'Affordable Storage' business and legally authorized to use the marks."  *Id.* ¶ 30.

To prevail on a Lanham Act unfair-competition claim, the plaintiff must establish: "(1) A false or misleading statement of fact about a product; (2) Such statement either deceived, or had the capacity to deceive a substantial segment of potential consumers; (3) The deception is material, in that it is likely to influence the consumer's purchasing decision; (4) The product is in interstate commerce; and (5) The plaintiff has been or is likely to be injured as a result of the statement at issue."  *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495 (5th Cir. 2000).  The Second Amended Complaint does not specify whether this claim arises under subsection (a)(1)(A), for false designation of origin, or subsection (a)(1)(B), for false advertising.  *See* Dkt. No. 35 ¶ 32.  But district courts in the Fifth Circuit usually apply the same five elements to claims under both subsections.  *See, e.g.*, *Nestle USA, Inc. v. Ultra Distribuciones Mundiales S.A. de C.V.*, 516 F. Supp. 3d 633, 651 n.11 (W.D. Tex. 2021); *see also Heartbrand Beef, Inc. v. Lobel's of N.Y., LLC*, No. V-08-62, 2009 WL 311087, at *2 (S.D. Tex. Feb. 5, 2009) ("[T]he Fifth Circuit consistently lists five elements to be proven

whether the claim arises under subsection (a)(1)(A) or (B) . . . .").  And David and Gargoyle argue that summary judgment is appropriate no matter the theory of liability.  Dkt. No. 49-1 at 15.  There is no reason for the Court to deviate from the common practice here.

As an initial matter, Michael's unfair-competition claim does not have the same statutory-standing defect as his trademark-infringement claim.  *See supra*, Section 2.B.i. Section 1125(a) provides a cause of action to "any person who believes that he or she is or is likely to be damaged by [the unlawful] act."  15 U.S.C. § 1125(a)(1).  Therefore, Section 1125(a) "does not require a plaintiff to establish ownership of a trademark as an element of its cause of action."  *Rex Real Est. I, LP*, 80 F.4th at 617.  That makes sense.  Section 1125(a) is broadly focused on deceptive trade practices, *Seven-Up Co.*, 86 F.3d at 1383, and its "plain language . . . does not require that a plaintiff possess or have used a trademark in U.S. commerce."  *Belmora LLC v. Bayer Consumer Care AG*, 819 F.3d 697, 706 (4th Cir. 2016).  So unlike his trademark-infringement claim, Michael is free to allege an unfair-competition claim despite not owning the Registered Marks.

Even so, summary judgment is still inappropriate.  Between their two motions, the defendants argue that there are no remaining fact issues on any of the elements of Michael's unfair-competition claim.  Dkt. Nos. 48 at 12–17; 49-1 at 15–18.  The summary-judgment evidence, however, is not nearly as one-sided as the defendants suggest.

### 1.    False or Misleading Statement of Fact

On the first element, the defendants contend that they have not used in commerce a false or misleading statement of fact about their self-storage services.  Dkt. Nos. 48 at 13–14; 49-1 at 15–17.  They maintain that the Second License Agreement gave SAS the right to use the Licensed Mark; it did not authorize SAS to use the Registered Marks or their derivations

to associate the business with the original Affordable Storage brand, nor did SAS ever make any false statements about Michael's storage facilities.[6]  *See* Dkt. Nos. 48 at 14; 49-1 at 16. Moreover, David and Gargoyle argue that there is nothing to stop the Hylands and SAS from using the Affordable Storage name and smiley face logo at the Slaton and Brownfield locations—just as they have for over two decades.  Dkt. No. 49-1 at 16–17.  Therefore, the argument concludes, there is no evidence that the defendants made a false or misleading statement of fact associating SAS with Michael's Affordable Storage business.  *Id.*

A reasonable jury could conclude otherwise.  As early as 2018, David knew from the First Arbitration Award that only Michael could use the Smiley Mark in Lubbock County, even if David technically owned the mark.  Dkt. No. 59-7 at 9 ¶ 17.  The First Arbitration Award also placed strict limits on David's ability to license the Smiley Mark.  *See id.* at 11– 12 ¶¶ 21–22.  Yet three years after the First Arbitration Award, David (through Gargoyle) licensed a mark to Gavin Hyland that falls squarely within Nolland's definition of the Smiley Mark; the Licensed Mark also features "a Smiley face with arms, legs, gloved or un-gloved hands, and feet."  *Id.* at 9 ¶ 17.  Then, in the Third Arbitration Award, the panel concluded that the Licensed Mark is the property of Postar IP and that David did not have authority to execute the Second License Agreement.  Dkt. No. 89 at 73.  Against this backdrop, a reasonable jury could conclude that the defendants used the Second License Agreement—signed only a month after the First License Agreement expired—to endorse

---

[6] The Hylands and SAS offer a twist on this argument.  They contend that the Second Amended Complaint only challenges the execution of the Second License Agreement, which "was a private agreement, not a publicly facing advertisement made 'in commerce.'"  Dkt. No. 48 at 14.  On that view, there can be no false statement of fact because no actual or potential customer viewed the Agreement.  *Id.*  That, however, is an unduly narrow view of Michael's allegations.  Fairly read, the Second Amended Complaint alleges that the Second License Agreement permits "continue[d] unauthorized use of the Registered Marks and derivations thereof."  Dkt. No. 35 ¶ 29.

the Hylands' use of an unauthorized mark to falsely maintain their association with the Affordable Storage brand.

As for the signage, there is a fact dispute about the Hylands' authority to use the Affordable Storage name and smiley face logo after the First License Agreement expired in 2021.[7]  In a sworn declaration, Michael represented that the parties negotiated to give Gavin Hyland "the right to use certain of the Registered Marks belonging to Postar IP" for a three-year period.  Dkt. No. 59-9 at 43 ¶ 11.  According to Michael, "[t]his would have given the Hyland Defendants three years to find their own trademark and brand, create a logo, and start using it, and to move away from use of the Affordable Storage trademark and brand." *Id.*  In other words, Michael represents in his declaration that the parties understood the First License Agreement to function as a complete (and final) encapsulation of the Hylands' association with the Affordable Storage brand.  *See id.*

Sworn declarations based on personal knowledge, even if they are self-serving, are sufficient to create a genuine issue of material fact.  *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160–61 (5th Cir. 2021).  Whether to believe Michael (or any other party) is up to the jury, not the Court.  *See Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 245 (5th Cir. 2016) ("[A]t this summary judgment stage . . . a court may make no credibility determinations." (internal quotation marks omitted)).  If the jury believes Michael's account, it could find that the Hylands and SAS misleadingly associated their self-storage business with the original

---

[7] The Hylands and SAS contest this framing.  They argue that the Second Amended Complaint does not allege that the signage constitutes unfair competition.  Dkt. No. 64 at 10.  But Count Two incorporates and realleges allegations in the preceding paragraphs, which include references to the signage.  *See* Dkt. No. 35 ¶¶ 24; 27.

Affordable Storage brand by continuing to use the name and smiley face logo after the parties agreed that they would cease such use at the end of the three-year lease term.

But the jury could also draw the opposite conclusion. There is the recorded phone call in which Michael told Myranda that anyone can use the Affordable Storage name and smiley face logo. Dkt. No. 38 ¶ 22. And recall that for several years Michael and David advertised SAS's Slaton and Brownfield locations as their own. *See* Dkt. No. 49-2 at 6. A jury could also look at the unsigned draft of the First License Agreement—which would have expressly barred SAS from using the name and logo at the conclusion of the lease term—and conclude that the memorialized version did not bar the Hylands from using the Affordable Storage name and logo after 2021. *See id.* at 100–05. Plus, a jury may even find that the signage—which is somewhat generic and located in areas where Michael does not have Affordable Storage locations—is unlikely "to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association" of SAS with the original Affordable Storage brand. *See* 15 U.S.C. § 1125(a)(1)(A); Dkt. No. 48 at 26. Likelihood of confusion, the Fifth Circuit has often said, is a question of fact. *See, e.g.*, *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 196 (5th Cir. 1998). Given these open questions, among others, Michael has carried his burden to show that fact issues remain on the first element of his unfair-competition claim.

### 2.    Deception

Next, David and Gargoyle argue that there is no evidence of deception or potential deception—the second element of the unfair-competition claim. Dkt. No. 49-1 at 17. But Michael points to more than a "scintilla of evidence" suggesting otherwise. *Anderson*, 477 U.S. at 252. He represents in his declaration that "[c]onsumers or customers of the Hyland

Defendants have called [him] or [his] Affordable Storage businesses confused about who owned the stores in Slaton or Brownfield and complained about the service they have received or their ability to reach someone on the phone to discuss the Hyland Defendants' services." Dkt. No. 59-9 at 45. He identifies a text message indicating that SAS packages were sent to Michael's Affordable Storage location on 32nd Street. Dkt. No. 62-8 at 1. And he notes that Myranda Hyland recognized in an interrogatory response that SAS received an invoice from a gravel company that was intended for one of Michael's businesses. *See id.* at 10; *see also Bradley v. Allstate Ins. Co.*, 620 F.3d 509, 527 n.21 (5th Cir. 2010) (explaining that interrogatory responses "may be used as evidence for assessing summary judgment" (citing Fed. R. Civ. P. 56(c)). Lastly, as noted above, deception (which is synonymous with likelihood of confusion) is a question of fact. *See* 15 U.S.C. § 1125(a)(1)(A); *Elvis Presley Enters., Inc.*, 141 F.3d at 196. From this evidence, a jury could conclude that SAS's name and smiley face signage has the capacity to deceive a substantial segment of consumers into thinking that the business is associated with the original Affordable Storage brand.

Granted, some of this evidence is from 2018—years before the defendants entered into the Second License Agreement. *See* Dkt. No. 62-8 at 1, 10. But the Hylands were still using the Affordable Storage name and logo in 2018, and Michael's representation in his declaration about customer confusion is not temporally limited. *See* Dkt. No. 59-9 at 45. Plus, to prevail on this element, Michael only needs to show that the defendants' alleged actions have the *capacity* to deceive. *See Pizza Hut, Inc.*, 227 F.3d at 495. At the very least, there is enough uncertainty to preclude summary judgment.

### 3.    Materiality

David and Gargoyle do not offer more clarity on the materiality element, arguing that the record is "void [of] any evidence" that the defendants' use of the Licensed Mark, for example, is "material to the consumer or influence[s] purchasing decisions." *See* Dkt. No. 49-1 at 17–18.  To show materiality, a plaintiff must "introduce evidence of the statement's impact on consumers." *Pizza Hut, Inc.*, 227 F.3d at 495.  Though it is a closer call, Michael has carried that burden here.

To start, Michael's evidence of misdirected packages and invoices is somewhat probative.  *See* Dkt. No. 62-8 at 1, 10.  Drawing all inferences in Michael's favor, the fact that items meant for one entity were sent to the other suggests that a customer could be equally deceived into thinking that the two Affordable Storage businesses are the same.

More significant, though, are Michael's statements in his declaration that consumers expressed actual confusion.  *See* Dkt. No. 59-9 at 45.  Again, Michael represents that the Hylands' customers "have called [him] or [his] Affordable Storage businesses confused about who owned the stores in Slaton or Brownfield." *Id.*  They also "complained about the service they have received or their ability to reach someone on the phone to discuss" the Hylands' self-storage services. *Id.*  The implication, then, is that the customers were actually confused about SAS's relationship with Michael's Affordable Storage business.

David and Gargoyle counter that these statements from unidentified customers are inadmissible hearsay, although they do not explain why. Dkt. No. 65 at 20.  To be sure, summary judgment evidence cannot be based on hearsay.  *Fowler v. Smith*, 68 F.3d 124, 126 (5th Cir. 1995).  But despite this general prohibition, a court "may consider hearsay at the summary judgment stage if the hearsay could be reduced to a form admissible at trial."

*Temple v. WFAA-TV, Inc.*, No. 3:21-CV-1250, 2023 WL 146249, at *1 (N.D. Tex. Jan. 9, 2023) (quotation omitted); *see Maurer v. Independence Town*, 870 F.3d 380, 384 (5th Cir. 2017) (noting that the evidence "cited to support or dispute a fact need only be *capable* of being presented in a form that would be admissible in evidence") (citation modified).

Michael's statements in his declaration could—at the very least—be reduced to an admissible form at trial. For starters, it is far from clear that they are inadmissible hearsay. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted in the statement. Fed. R. Evid. 801(c). Here, Michael does not appear to offer the customers' out-of-court statements for the truth of the matter asserted. Take the second statement, for example. Michael is not looking to prove that the customers received poor service at the Slaton and Brownfield locations or that they could not reach an SAS employee to discuss the Hylands' self-storage business. Instead, Michael needs to prove the "touchstone" of the unfair competition claim: that the customers were confused about the relationship between the two businesses. *Matrix Essentials, Inc.*, 988 F.2d at 592. Thus, the evidentiary value of the statement does not lie in the truth of its assertions; rather, it lies in the fact that the customers were apparently confused because they called Michael, not SAS, to complain. Put differently, "the significance of [the] statement 'lies solely in the fact that it was made.'" *United States v. Cantu*, 876 F.2d 1134, 1137 (5th Cir. 1989) (quoting *United States v. Bobo*, 586 F.2d 355, 372 (5th Cir. 1978)). It is not offered to prove the truth of the matter asserted. *Id.*

The first statement is a bit trickier. Michael contends that customers called him or his businesses "confused about who owned the stores in Slaton or Brownfield." Dkt. No. 59-9 at 45. The context of those statements is not clear. If the dialogue was posed in the form of a question ("Who owns the Slaton location?"), then there would be no hearsay

problem. *See United States v. Lewis*, 902 F.2d 1176, 1179 (5th Cir. 1990) ("[M]ost questions and inquires[] are not hearsay because they do not, and were not intended to, assert anything."). Or if the customers made statements that compel an inference of confusion—like the second statement above—then those too would not constitute inadmissible hearsay because they would not be offered for the truth of the matter asserted. The Court would need more trial context to be sure. But at this juncture, the fact that the first statement *could* be reduced to an admissible form at trial is enough. *See Maurer*, 870 F.3d at 384.

In short, there remains a genuine factual dispute on the materiality prong of the unfair-competition claim. A reasonable jury could conclude based on Michael's testimony, as well as the evidence of misdirected packages and invoices, that consumers were actually confused by SAS's use of the Affordable Storage name and signage. No more is required to defeat summary judgment on this element.

### 4.    Interstate Commerce

The defendants also contend that there is no genuine fact dispute on the fourth, interstate-commerce element. As they put it, this case "does not involve interstate commerce," Dkt. No. 48 at 15, because "[s]elf-storage is, for the most part, a very local business." Dkt. No. 49-1 at 18. This argument is unpersuasive.

The Lanham Act defines "commerce" to mean "all commerce which may lawfully be regulated by Congress." 15 U.S.C. § 1127. Congress's power under the Commerce Clause, in turn, includes the power to regulate interstate commerce. U.S. Const. art. I, § 8, cl. 3. The Supreme Court has broadly interpreted this power to permit regulation of the channels and instrumentalities of interstate commerce, as well as activities that substantially affect interstate commerce. *Gonzales v. Raich*, 545 U.S. 1, 16–17 (2005) (citing *Perez v. United*

*States*, 402 U.S. 146, 150 (1971)).  This authority allows Congress to regulate "purely local activities" that have a "substantial effect on interstate commerce" in the aggregate.  *Id.* at 17.

This understanding has translated over to the Lanham Act.  "Because one need not direct goods across state lines for Congress to regulate the activity under the Commerce Clause, there is likewise no such per se condition for satisfying the Lanham Act's 'use in commerce' requirement."  *Perry v. H.J. Heinz Co. Brands, LLC*, 994 F.3d 466, 474 (5th Cir. 2021) (quoting *Christian Faith Fellowship Church v. adidas AG*, 841 F.3d 986, 995 (Fed. Cir. 2016)).  Even a "brief study of modern Commerce Clause cases reveals that seemingly *de minimis* intrastate activities can influence interstate commerce, be regulated by Congress, and thus count as uses in commerce for purposes of the Lanham Act."  *Id.*

Against that backdrop, summary judgment is clearly inappropriate on the interstate-commerce element.  Here is just one example: Michael points to evidence that the Hylands use derivatives of the Registered Marks and/or the Affordable Storage name and smiley face logo on their website.  *See, e.g.*, Dkt. No. 62-7 at 17–20.  Of course, it is blackletter law that the internet is a "facilit[y] or means of interstate commerce."  *United States v. Barlow*, 568 F.3d 215, 220 (5th Cir. 2009).  Thus, there remains at least a fact dispute about whether the defendants' self-storage business is in interstate commerce.

### 5.    Injury

Lastly, the defendants argue that there is no evidence that Michael is likely to be injured by the defendants' allegedly false or misleading statements.  Dkt. Nos. 48 at 15–16; 49-1 at 18.  This argument fails, too.  If the jury agrees with Michael's theory of the case— that the defendants are falsely associating themselves with the Affordable Storage brand by using unauthorized marks or the Affordable Storage name and signage in areas where he

has exclusive rights—then it stands to reason that Michael is "likely" to be injured by that conduct. *See Pizza Hut, Inc.*, 227 F.3d at 495. And for reasons explained, Michael has produced some evidence of actual consumer confusion. *See supra*, Section 2.B.ii.a.3. Therefore, like the other elements of the unfair-competition claim, there are still genuine issues of material fact as to Michael's alleged injuries. The Court therefore denies summary judgment on this claim.

### b.    Reverse Passing Off under the Lanham Act

Next is Count Three: reverse passing off under the Lanham Act. Michael alleges that the defendants are passing their self-storage business off as Michael's by falsely designating their services through continued use of the Registered Marks, notwithstanding Michael's exclusive right to use the marks in Lubbock County. Dkt. No. 35 ¶ 34. This continued use, Michael contends, creates a likelihood of consumer confusion. *Id.*

Reverse passing off (or reverse palming off, as it is sometimes called) is "a species of Lanham Act violation in which a 'producer misrepresents someone else's goods or services as his own.'" *Jaso v. The Coca Cola Co.*, 435 F. App'x 346, 356 n.9 (5th Cir. 2011) (quoting *Dastar Corp.*, 539 U.S. at 27 n.1). "A defendant may also be guilty of reverse palming off by selling or offering for sale another's product that has been modified slightly and then labeled with a different name." *Roho, Inc. v. Marquis,* 902 F.2d 356, 359 (5th Cir. 1990). In *Dastar Corp.*, the Supreme Court held that Section 1125(a) of the Lanham Act covers claims for reverse passing off. 539 U.S. at 30. Given the cause of action's roots in Section 1125(a), a plaintiff must prove that the defendant used a "false designation of origin" of "goods or services." *McArdle v. Mattel Inc.*, 456 F. Supp. 2d 769, 783 (E.D. Tex. 2006) (quoting 15 U.S.C. § 1125(a)(1)). And as with the unfair-competition claim, this requirement includes a

likelihood-of-confusion analysis. *See Keane v. Fox Television Stations, Inc.*, 297 F. Supp. 2d 921, 935 (S.D. Tex. 2004).

Because fact issues remain on the unfair-competition claim, and because of the substantial overlap between the causes of action, the Court also denies summary judgment on the reverse passing off claim. As explained, there are still jury questions on whether the defendants made false or misleading statements by using the Licensed Mark or the Affordable Storage name or smiley face logo after the expiration of the Second License Agreement. *See* Dkt. No. 48 at 19. In light of the Third Arbitration Award, a reasonable jury could find that the defendants used an unauthorized derivative of the Registered Marks after the permission lapsed. In doing so, the Hylands and SAS (in theory) misrepresented themselves as the original Affordable Storage brand in a way that creates a likelihood of consumer confusion—a quintessential fact issue. *See Elvis Presley Enters., Inc.*, 141 F.3d at 196. Moreover, as explained in the context of the unfair-competition claim, the defendants' assertion that there is no evidence to satisfy the interstate-commerce element is unavailing. Dkt. Nos. 48 at 20–21; 49-1 at 19. The Court therefore denies summary judgment on Michael's reverse passing off claim under the Lanham Act.

### c.    Palming Off

Now for the state claims. In Count Four, Michael alleges that the defendants— through the false designation of unauthorized marks—are palming off their self-storage services as Michael's in violation of the common law. Dkt. No. 35 ¶ 36. These allegations significantly overlap with those for the reverse passing off claim.[8] *See id.* ¶¶ 34, 36.

---

[8] Palming off is the opposite of reverse passing off. *Dastar Corp.*, 539 U.S. at 27 n.1. It occurs "when a producer misrepresents his own goods or services as someone else's." *Id.*

Texas common law recognizes palming off as a single theory under the broader umbrella of unfair-competition law. *U.S. Sporting Prods., Inc. v. Johnny Stewart Game Calls, Inc.*, 865 S.W.2d 214, 217 (Tex. App.—Waco 1993, writ denied). It is rarely used, and the elements of the claim are not clearly defined in the case law.[9] But the parties appear to agree that the plaintiff must at least show that the defendant's actions caused a likelihood of confusion. *See* Dkt. Nos. 35 ¶ 36; 48 at 21; 49-1 at 21. This tracks the reasoning in *Hudgens v. Goen*, 673 S.W.2d 420, 423 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.), which one commentator cited for the elements of a palming off claim. James E. Hudson, III, *A Survey of the Texas Unfair-Competition Tort of Common-Law Misappropriation*, 50 Baylor L. Rev. 921, 924 & n.9 (1998); *see* Dkt. No. 49-1 at 21 (David and Gargoyle relying on *Hudgens* for the relevant elements). It is also consistent with the views of a leading trademark scholar, who notes that palming off is typically a "synonym" for likelihood of confusion. 3 McCarthy on Trademarks § 25:2. The Fifth Circuit agrees: "Unfair competition is a common law tort that occurs when one business entity 'palms off' its products as those of another . . . . [T]he test is likelihood of confusion." *Ky. Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 382 (5th Cir. 1977); *see also B. H. Bunn Co. v. AAA Replacement Parts Co.*, 451 F.2d 1254, 1261, (5th Cir. 1971) ("[T]he offending mark must so closely approximate the original mark that there is likely to be 'palming off' of one product as the other.").

Under *Hudgens*, a palming-off plaintiff must prove two elements: (1) the "plaintiff's use of its trade name has acquired a secondary meaning; and (2) "the similarity of the name used by the defendant's place of business would be likely to confuse the public." 673 S.W.2d at 423. Secondary meaning occurs when, in the public's mind, a mark becomes

---

[9] The Texas Civil Pattern Jury Charge does not include a model instruction for palming off.

associated with a particular source. *Horseshoe Bay Resort Sales Co.*, 53 S.W.3d at 807; *see Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 211 (2000).

With that understanding of the applicable law, it is again clear that genuine fact disputes remain. Secondary meaning—which the Fifth Circuit has labeled a question of fact—is especially up in the air. *Amazing Spaces, Inc.*, 608 F.3d at 234. David and Gargoyle assert that "when the public sees an advertisement for 'Affordable Storage' with a smiley face logo, the public thinks it is a storage facility" and does not associate it with Michael's Lubbock locations and the original Affordable Storage brand. Dkt. No. 49-1 at 21. But Michael's evidence of actual confusion suggests otherwise. *See* Dkt. No. 59-9 at 45.

As for likelihood of confusion, the Hylands and SAS largely dodge the question, arguing instead that they did not use the Registered Marks after the Second License Agreement expired. Dkt. No. 48 at 22. Again, this argument misses the point. A rational jury could find based on the Third Arbitration Award that the Hylands and SAS employed an unauthorized derivative of the Registered Marks owned by Postar IP. Furthermore, based on Michael's representations about his conversations with actual consumers (*see* Dkt. No. 59-9 at 45), a jury could conclude that there is a likelihood of confusion stemming from the Hylands' use of the Affordable Storage name and smiley face logo.[10] Or the jury could come out the other way—maybe it would find that there was no impediment to SAS using the name and logo beyond the three-year lease term or that no consumer would confuse the

---

[10] David and Gargoyle argue that they are entitled to summary judgment on this claim because there is no evidence that Michael and SAS are in competition. Dkt. No. 49-1 at 20. But a jury may think differently: SAS has a location in Lubbock County, the geographic area for which Michael has exclusive rights to the Registered Marks and where he has many Affordable Storage locations.

Hylands' locations for Michael's.  *See supra*, Section 2.B.ii.a.1.  As with the other claims,
that uncertainty precludes summary judgment on Count Four.

### d.    Unfair Competition by Common-Law Misappropriation

The story is much the same for Count Five: unfair competition by common-law
misappropriation.  Here, Michael alleges that he created the Registered Marks, that the
defendants were burdened with little or none of the expense to develop those marks, and
that the defendants' use of the marks or their derivatives in competition with him is
therefore unlawful under Texas common law.  Dkt. No. 35 ¶¶ 37–38.

"The elements of the tort of unfair competition by misappropriation, also called
'common-law misappropriation,' are '(1) the creation of [the] plaintiff's product . . . through
extensive time, labor, skill, and money; (2) the defendant's use of that product in
competition with the plaintiff, thereby gaining a special advantage in that competition (i.e.,
a 'free ride') because defendant is burdened with little or none of the expense incurred by the
plaintiff; and (3) commercial damage to the plaintiff.'"  *Baylor Scott & White v. Project Rose
MSO, LLC*, 633 S.W.3d 263, 287 (Tex. App.—Tyler 2021, pet. denied) (quoting *BP Auto.,
LP v. RML Waxahachie Dodge, LLC*, 448 S.W.3d 562, 572 (Tex. App.—Houston [1st Dist.]
2014, no pet.)).  Like palming off, "[u]nlawful competition by misappropriation is one of
multiple torts in the unfair competition umbrella."  *Id.*

On the first element, there appears to be a dispute about whether Michael created the
Registered Marks.  Michael contends that the parties agree on this point (Dkt. No. 58 at 39–
40), but David and Gargoyle disagree (Dkt. No. 49-1 at 23).  According to those defendants,
Michael and David created the marks when they were working together.  *Id.*  They do not
cite any summary-judgment evidence for that proposition.  *See id.*  Further, David and

Gargoyle argue that, because the Registered Marks were ultimately assigned to Postar IP, "there can be no doubt that the marks in question are not Michael Postar's creation." *Id.* These arguments do not hold water. For one, there is evidence in the form of Michael's declaration that Michael started the Affordable Storage business and only later brought David into the fold. *See* Dkt. No. 59-1 ¶ 2. Drawing all inferences in Michael's favor, a jury could find that he created the Registered Marks. Plus, the fact that the Registered Marks were assigned to Postar IP years after they were first used says nothing about who created them. Thus, there are fact disputes remaining on the first element of this claim.

Next, the defendants contend that there is no evidence that they are using the Registered Marks or their derivations in competition with Michael. *See* Dkt. No. 49-1 at 23. But, again, a jury could find that Michael and SAS compete in Lubbock County, where SAS has a location and where Michael has exclusive rights to use the Registered Marks in connection with many Affordable Storage locations. *See supra*, note 10. And consider too the evidence that consumers are actually confused about the connection between Michael's Affordable Storage locations and SAS's. *See* Dkt. No. 59-9 at 45. That suggests that the parties' self-storage facilities are not as disassociated as the defendants say.

For the same reasons, genuine fact disputes remain on the third element— commercial damage. Michael's evidence of actual confusion—limited as it is—suggests that consumers could choose an SAS location in Lubbock County because of its purported association with the original Affordable Storage brand. *See id.* At this stage, Michael's showing is enough to defeat summary judgment. *See Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264 (5th Cir. 1991) ("[T]he plaintiff need not offer all of the evidence tending to support its case, only enough evidence 'from which a jury might return a verdict in [its]

favor.'" (quoting *Anderson*, 477 U.S. at 257) (alteration in original)).  Thus, the Court denies summary judgment on Michael's claim for unfair competition by common-law misappropriation.

### e.    Civil Conspiracy

Next, in Count Five, Michael alleges that the defendants conspired to accomplish an unlawful purpose—namely, the Hylands' unauthorized use of the Registered Marks after the First License Agreement expired.  Dkt. No. 35 ¶ 40.  The defendants accomplished this purpose, Michael alleges, through the overt act of executing the Second License Agreement. *Id.*  This civil conspiracy claim also arises under Texas common law.

To show a civil conspiracy, a plaintiff must prove five elements: "(1) two or more persons, (2) an object to be accomplished, (3) a meeting of minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages."  *Baty v. ProTech Ins. Agency*, 63 S.W.3d 841, 864 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

To show a meeting of minds, "the participants must at least have knowledge of the object and purpose of a conspiracy."  *Lesikar v. Rappeport*, 33 S.W.3d 282, 302 (Tex. App.—Texarkana 2000, pet. denied).  Such knowledge and agreement "may be established by circumstantial evidence."  *Id.*  Generally, facts and circumstances that permit a "natural inference . . . that the unlawful, overt acts were committed in furtherance of common design, intention, or purpose of the alleged conspirators" are sufficient.  *Id.* (quoting *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 581 (Tex. 1963)).  The plaintiff does not need to show that the conspirators took every action "in concert" with each other.  *Id.* (quoting *Int'l Bankers Life Ins. Co.*, 368 S.W.2d at 582).  "[J]oint participation in the

transactions" and "enjoyment of the fruits of the transactions" allow a court to reasonably infer a conspiracy. *Id.* (quoting *Int'l Bankers Life Ins. Co.*, 368 S.W.2d at 582).

The defendants argue that there is no genuine dispute of material fact as to whether the defendants had a meeting of minds. Dkt. Nos. 48 at 28–29; 49-1 at 25. But there is sufficient circumstantial evidence to make it past summary judgment on this element. When the brothers split in 2017, Gavin Hyland chose to work with David, not Michael. Dkt. No. 87-1 at 12. Then, when the First License Agreement expired, the defendants entered into the Second License Agreement only a month later. *See* Dkt. No. 50 at 46–48. That Agreement authorized Gavin Hyland to use a derivative of the Registered Marks in Lubbock County even though, according to David's deposition testimony, "all the employees"—Gavin included—"were aware of how the company was split." Dkt. No. 59-16 at 46; *see* Dkt No. 89 at 69. With this evidence, a jury could find that David and Hyland had a meeting of minds to employ the Second License Agreement to evade the geographic restrictions in the Postar IP Company Agreement.

Following the Third Arbitration Award, summary judgment is clearly inappropriate on the fourth, unlawful-act element. The panel found that "David licensed a mark to Mr. Hyland that is a variation of a Postar IP mark that belongs to Postar IP" and that "David did not have the authority to license that mark to Mr. Hyland." Dkt. No. 89 at 69. So there is enough evidence for a jury verdict on this element.

Lastly, the defendants' argument on damages fails for the same reasons as before. *See supra*, Section 2.B.ii.a.5. Michael has some evidence of actual consumer confusion, and it is undisputed that the Hylands are operating a self-storage facility in Lubbock County,

where Michael has exclusive rights to use the Registered Marks and their derivations.  That creates a fact dispute for damages.  The Court denies summary judgment on this claim.

### f.    Assisting or Encouraging

Count Six, assisting or encouraging under Texas common law, is similar to the civil conspiracy claim.  According to Michael, the defendants "engaged in activity which accomplished a tortious result."  Dkt. No. 35 ¶ 42.  More specifically, he claims that David assisted the Hylands with committing unfair competition by using Gargoyle to enter into the Second License Agreement, despite knowing that it did not own the Registered Marks or their derivations.  *Id.*  Moreover, David's "assistance or encouragement was a substantial factor in causing Hyland's tortious conduct."  *Id.*

Only David and Gargoyle move for summary judgment on this claim.  *See* Dkt. No. 49-1 at 27–28.  Michael appears to agree with them that the elements of the assisting-or-encouraging claim come from Section 876(b) of the Restatement (Second) of Torts.[11]  *See id.*; Dkt. No. 61 at 46–47.  Under that provision, the defendant is liable for the conduct of another which causes harm if the defendant "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself."  *Juhl v. Airington*, 936 S.W.2d 640, 643 (Tex. 1996) (quotation omitted).

David and Gargoyle argue that they are entitled to summary judgment on this claim because there is no evidence that David had the requisite knowledge to assist or encourage the Hylands or SAS to commit a tort.  Dkt. No. 49-1 at 28.  They point to David's testimony

---

[11] Texas law may not even recognize a cause of action for assisting or encouraging that is distinct from civil conspiracy.  *See Reynolds v. Sanchez Oil & Gas Corp.*, No. 01-18-940-CV, 2023 WL 8262764, at *9 (Tex. App.—Houston [1st Dist.] 2023, no pet.) (collecting cases).  But David and Gargoyle do not argue that this claim is not cognizable.

in his affidavit that he "was not thinking in legal terms" when he licensed the Licensed Mark to Gavin Hyland. Dkt. No. 49-2 at 9. In David's mind, the Licensed Mark "was different than the Postar IP logos," and it was his right to license the mark because his "employees came up with [it] after the split." *Id.* Given this testimony, the argument goes, "David did not believe he was assisting anyone in committing" a tort. Dkt. No. 49-1 at 28.

This argument ignores the First Arbitration Award. After David began using an anthropomorphic smiley character following the split, Nolland concluded that only Michael could use the Smiley Mark in Lubbock County. *See supra*, Section 1.B.i. Yet three years after the First Arbitration Award, David licensed to Gavin Hyland a mark that falls squarely within Nolland's definition of the Smiley Mark. *See* Dkt. No. 59-7 at 9 ¶ 17. In fact, David seems to acknowledge in his affidavit that the Licensed Mark is in tension with the First Arbitration Award. *See* Dkt. No. 49-2 at 9–10 ("It had been many years since the 2018 Arbitration regarding Smiley Character and that was not fresh on my mind."). And that context does not even consider the later conclusion in the Third Arbitration Award that David did not have authority to license the Licensed Mark to Gavin Hyland. Dkt. No. 89 at 69. Thus, a genuine fact dispute remains as to David's knowledge. He is not entitled to summary judgment on this claim.

### iii.    The Court grants partial summary judgment to the defendants on Michael's claim for declaratory relief.

Finally, there is Michael's claim for relief under the Declaratory Judgment Act, 28 U.S.C. § 2201. Dkt. No. 35 ¶¶ 43–52. Michael asks the Court to enter a declaratory judgment that the "Defendants do not own the Registered Marks or derivations thereof, and therefore [the] Defendants' Second License Agreement is null and void." *Id.* ¶ 45.

– 44 –

The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). When considering an action for declaratory judgment, a "court must ask (1) whether an actual controversy exists between the parties in the case; (2) whether it has authority to grant declaratory relief; and (3) whether to exercise its broad discretion to decide or dismiss a declaratory judgment action." *Frye v. Anadarko Petroleum Corp.*, 953 F.3d 285, 294 (5th Cir. 2019) (internal quotation marks omitted). "'[A]ctual controversy' refers to an Article III case or controversy." *Id.* (citing *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126 (2007)).

To start, there is no actual controversy about whether the defendants "own the Registered Marks or derivations thereof." Dkt. No. 35 ¶ 45. The defendants acknowledge that Postar IP owns the Registered Marks. Dkt. Nos. 48 at 32; 49-1 at 29. And the Third Arbitration Award makes clear that "any 'derivation' (mark that includes one of the Postar IP marks or a variation of one of those marks) is the property of Postar IP." Dkt. No. 89 at 34. Because there is no actual controversy as to who owns the Registered Marks and its derivations, the Court grants summary judgment to the defendants as to this part of Michael's claim for declaratory relief.

That leaves Michael's second request: to declare the Second License Agreement null and void. *See* Dkt. No. 35 ¶ 45. The Court will not grant such relief at this stage. For one, with fact issues remaining as to injury, it is unclear whether Michael can show that the Second License Agreement has or continues to injure him in the constitutional sense. After all, an Article III injury in fact must be "actual or imminent." *Clapper v. Amnesty Int'l USA*,

568 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)).  The arbitration panel seemed to pick up on this point.  Despite concluding that Michael lacked authority to license a derivation of the Registered Marks to Gavin Hyland, the panel denied Michael's request to void the Second License Agreement.  Dkt. No. 89 at 69.  It apparently did so because Gavin Hyland is no longer using the Licensed Mark.  *Id.* at 68.  Indeed, there is evidence that Gavin only used the mark for six weeks several years ago. Dkt. No. 85-1 at 17.  So a judgment declaring the Second License Agreement null and void may not even redress Michael's claimed injuries.  *See Clapper*, 568 U.S. at 409.  Given this uncertainty, "considerations of practicality and wise judicial administration" counsel against exercising the Court's discretion to enter declaratory relief at this juncture.  *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995).

### iv.    The Court denies summary judgment on the defendants' statute-of-limitations defenses.

The defendants, for their part, allege that Michael's claims are barred under the applicable statutes of limitations.  The Hylands and SAS maintain that both the federal and state claims are time-barred, whereas David and Gargoyle only challenge the state claims. Dkt. Nos. 48 at 35–36; 49-1 at 31.  Because there are outstanding fact issues, and because the defendants have not established that they are entitled to judgment as a matter of law, the Court denies summary judgment on these affirmative defenses.[12]

---

[12] "For a defendant to obtain summary judgment on an affirmative defense, it must establish beyond dispute all of the defense's essential elements."  *Bank of La. v. Aetna U.S. Healthcare Inc.*, 468 F.3d 237, 241 (5th Cir. 2006).  Thus, while a defendant can prevail on a statute-of-limitations defense at the summary-judgment stage, there must be no factual dispute about when the limitations period began to run.  *See In re Beef Industry Antitrust Litig.*, 600 F.2d 1148, 1170 (5th Cir. 1979).

### 1.    Federal Claims

The Lanham Act does not contain a statute of limitations.  *See Jaso*, 435 F. App'x at 356.  Accordingly, courts refer to analogous state statutes of limitations in resolving federal trademark and unfair competition claims.  *See, e.g.*, *Mary Kay, Inc. v. Weber*, 601 F. Supp. 2d 839, 859 (N.D. Tex. 2009).  "In Texas, a 'Lanham Act violation is governed by the four[-]year statute of limitations under Texas law.'"  *Id.* at 860 (quoting *Edmark Indus. SDN. BHD. v. S. Asia Int'l (H.K.) Ltd.*, 89 F. Supp. 2d 840, 846 (E.D. Tex. 2000)); *see also Jaso*, 435 F. App'x at 356 ("The parties do not dispute, and we assume for purposes of this case, that the most analogous Texas statute of limitations for a Lanham Act claim is the four-year statute of limitations applied to fraud claims under § 16.004 of the Texas Civil Practice & Remedies Code.").  Here, the parties agree that Texas law sets out a four-year limitations period for Michael's federal claims.  Dkt. Nos. 48 at 35; 58 at 48.

Michael commenced this action on January 12, 2024.  Dkt. No. 1.  Thus, any federal causes of action that accrued before January 12, 2020, are time-barred.  According to the Hylands and SAS, that means Michael cannot proceed on any of his Lanham Act claims.  Dkt. No. 35 at 48.  As they put it, Michael was "well aware" of SAS's use of the Affordable Storage name and smiley face logo since at least 2013.  *Id.*  Indeed, he included the Slaton and Brownfield locations in his Affordable Storage advertising well before 2020.  *Id.*

But Michael alleges that the federal violations did not occur until the defendants entered into the Second License Agreement on August 26, 2021.  Dkt. No. 58 at 48; *see* Dkt. No. 35 ¶ 28 (alleging Lanham Act unfair competition "[i]n executing the Second License [Agreement]").  A jury could find that at all times before then SAS's use of the Affordable Storage name and the smiley face logo was with Michael's consent.  *See* Dkt. No. 59-9 at 43.

– 47 –

That was, after all, the stated point of the First License Agreement: to give the Hylands "time to find a new logo or brand for their business." Dkt. No. 58 at 36. Because Michael argues that the complained-of conduct did not occur until 2021—which is within the four-year limitations period—there remain fact disputes for a jury on this affirmative defense.

### 2.    State Claims

Turning to the state claims, there is a legal dispute about the applicable limitations period. The defendants maintain that Texas's two-year statute of limitations for tort actions bars Michael's state claims. Dkt. Nos. 48 at 36; 49-1 at 31; *see* Tex. Civ. Prac. & Rem. Code § 16.003. Michael, for his part, argues that his state claims are continuing torts in that they involve "wrongful conduct inflicted over a period of time that is repeated until desisted, and each day creates a separate cause of action." Dkt. No. 58 at 49 (quoting *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 592 (Tex. 2017)). On that view, the claim does not accrue until the allegedly wrongful conduct ceases, thus allowing his state claims to proceed. *Id.*

At this stage, the defendants have not "establish[ed] beyond dispute" that their statute-of-limitations defense applies. *Bank of La.*, 468 F.3d at 241. No defendant addressed Michael's continuing-tort theory in their reply in support of their motion for summary judgment. *See* Dkt. Nos. 64; 65. And the case law is far from clear. Another judge in this district noted the widespread disagreement on the appropriate statute of limitations for Texas unfair competition claims. *See Louis Vuitton Malletier, S.A.S. v. Keep it Gypsy, Inc.*, No. 3:23-CV-2569, 2024 WL 3927819, at *8–9 (N.D. Tex.) (Horan, J.), *report & recommendation adopted*, 2024 WL 3933673 (N.D. Tex. Aug. 23, 2024). Some courts have applied the two-year limitations period. *See id.* Others have recognized that "Texas law treats trademark-infringement as a 'continuing tort.'" *Springboards to Educ., Inc. v. Scholastic Book Fairs, Inc.*,

No. 3:17-CV-054, 2018 WL 1806500, at *8 (N.D. Tex. Apr. 17, 2018) (quoting *Horseshoe Bay Resort Sales Co.*, 53 S.W.3d at 812). And still other courts have reasoned that Texas's two-year statute of limitations applies to unfair competition claims, but a plaintiff can still bring such claims for violations within the limitations period. *See, e.g.*, *Derrick Mfg. Corp. v. Sw. Wire Cloth, Inc.*, 934 F. Supp. 796, 807–08 (S.D. Tex. 1996).

Because trademark infringement falls within the broader umbrella of unfair competition, *Baylor Scott & White*, 633 S.W.3d at 287, Michael's claims for palming off and common-law misappropriation—two other forms of unfair competition—may also be continuing torts. The same would go for the civil conspiracy and assisting or encouraging claims. *See Agar Corp., Inc. v. Electro Cirs. Int'l, LLC*, 580 S.W.3d 136, 138 (Tex. 2019) (holding that the statute of limitations for civil conspiracy coincides with that of the underlying tort); 36-A O'Connor's Texas Causes of Action § 4 (2026 ed.) ("Assisting or encouraging does not have its own statute of limitations . . . Thus, the limitations period for a claim of assisting or encouraging depends on the limitations period for the underlying tort."). The defendants have so far made no attempt to explain why the continuing-tort doctrine does not foreclose Michael's state claims.

A defendant asserting an affirmative defense "must establish beyond peradventure *all* of the essential elements" of the defense "to warrant [summary] judgment in his favor." *Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003) (emphasis in original) (quoting *Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 372 (5th Cir. 2002)). "[T]he 'beyond peradventure' standard is 'heavy,'" requiring a showing that the movant is entitled to judgment as a matter of law. *Carolina Cas. Ins. Co. v. Sowell*, 603 F. Supp. 2d 914, 923 (N.D. Tex. 2009) (quotation omitted); *see* Fed. R. Civ. P. 56(a). The defendants have not carried

their burden at this stage.  Therefore, they are not entitled to summary judgment on their statute-of-limitations defense.

### v.    Injunctive relief is inappropriate at this time.

In his amended complaint, Michael asks the Court to enjoin the defendants from using the Registered Marks and their derivations in connection with their storage business during this suit, which he defines to include the Affordable Storage name and smiley face logo.[13]  Dkt. No. 35 ¶¶ 53–59.  A preliminary injunction is an "extraordinary and drastic remedy" that may not issue unless the plaintiff shows clear entitlement to relief.  *TitleMax of Tex., Inc. v. City of Dallas*, 142 F.4th 322, 328 (5th Cir. 2025) (quoting *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974)).  This is in large part because a preliminary injunction is meant to "preserve the status quo" until a trial on the merits.  *Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560, 561 (5th Cir. 1971).

Here, Michael asks the Court to dramatically alter the status quo by enjoining the defendants from using branding that has been in place since 2011.  *See* Dkt. No. 35 ¶ 56. And he does so against the backdrop of significant outstanding factual disputes on almost all his claims.  Thus, he has not shown a significant likelihood of success on the merits, nor does the balance of hardships tip in his favor.  *See Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 268 (5th Cir. 2012).  Either conclusion is sufficient to deny Michael's request for a preliminary injunction.  *Id.*

\*                    \*                    \*

In sum, the Court grants the defendants' summary judgment motions as to the trademark infringement claim under Section 1114 of the Lanham Act.  Because Michael

---

[13] Michael did not file a separate motion for preliminary injunction.

does not own the Registered Marks, he lacks statutory standing to bring an infringement action under that provision. The Court also grants partial summary judgment on Michael's claim for declaratory relief because there is no actual controversy that Postar IP owns the Registered Marks. Genuine issues of material fact remain, however, as to the other claims. And the defendants have not shown at this stage that they are entitled to summary judgment on their limitations defense, nor has Michael met the high bar for preliminary injunctive relief. Thus, the Court otherwise denies the defendants' summary-judgment motions.

**3.    Motion to Exclude Expert Testimony of John M. Cone**

    **A.    Legal Standard**

The admissibility of evidence is governed by federal law. *See Reed v. Gen. Motors Corp.*, 773 F.2d 660, 663 (5th Cir. 1985). Federal Rule of Evidence 702 permits opinion testimony from a witness "'qualified as an expert by knowledge, skill, experience, training, or education' if the expert's knowledge will assist the trier of fact and (1) 'the testimony is based on sufficient facts or data,' (2) 'the testimony is the product of reliable principles and methods,' and (3) 'the expert has reliably applied the principles and methods to the facts of the case.'" *Cedar Lodge Plantation, LLC v. CSHV Fairway View I, LLC*, 753 F. App'x 191, 195 (5th Cir. 2018) (quoting Fed. R. Evid. 702). The trial court is the gatekeeper, permitting expert testimony only if the proponent establishes its admissibility by a preponderance of the evidence. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *Mathis v. Exxon Corp.*, 302 F.3d 448, 459–60 (5th Cir. 2002).

"[T]he rejection of expert testimony is the exception rather than the rule." *Harrison v. Aztec Well Servicing Co.*, No. 1:20-CV-038, 2022 WL 125315, at *2 (N.D. Tex. Jan. 13, 2022) (Hendrix, J.) (quoting Fed. R. Evid. 702, advisory committee's notes to 2000 amendment).

The gatekeeping function applies only to the expert testimony's admissibility; it does not extend to its weight, which is properly left to the jury. *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996). After all, "[i]t is the role of the adversarial system, not the court, to highlight weak evidence." *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

Under Rule 704(a), "[a]n opinion is not objectionable just because it embraces an ultimate issue." But "this rule does not allow an expert to render conclusions of law." *Snape-Drape, Inc. v. C.I.R.*, 98 F.3d 194, 198 (5th Cir. 1996). This is because "our legal system reserves to the trial judge the role of deciding the law for the benefit of the jury." *Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997). "[A]llowing an expert to give his opinion on the legal conclusions to be drawn from the evidence both invades the court's province and is irrelevant." *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983). The expert must "bring to the jury more than the lawyers can offer in argument." *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992) (quotation omitted). "[T]he task of separating impermissible questions which call for overbroad or legal responses from permissible questions is not a facile one." *Thomas v. W&T Offshore, Inc.*, Civ. A. No. 16-14694, 2018 WL 4223589, at *7 (E.D. La. Aug. 27, 2018) (quoting *Owen*, 698 F.2d at 240). But it still "requires courts to exclude questions or answers from experts that 'would supply the jury with no information other than the expert's view of how its verdict should read.'" *Id.* (quoting *Owen*, 698 F.2d at 240).

### B.    Analysis

The Hylands and SAS move to exclude the expert testimony of John M. Cone, an attorney who specializes in trademark law.  Dkt. No. 51; *see* Dkt. No. 52 at 22–41 (Cone's expert report).  Michael identified Cone as his expert witness to testify about (1) whether Michael has protectable rights in various marks; (2) whether those rights have priority over the Hylands' use of certain marks; and (3) whether the Hylands' use of those marks is likely to cause confusion.  *See* Dkt. No. 56 at 6.

### i.    According to the defendants, Cone's opinions in his expert report are impermissible legal conclusions.

The defendants do not challenge Cone's qualifications as an expert.  *See* Fed. R. Evid. 702.  Nor do they challenge the reliability of the methodology underlying Cone's expert report.  *See id.*; *Daubert*, 509 U.S. at 590–92.  Instead, they argue that the opinions in his report are impermissible legal conclusions that invade the province of the Court and merely tell the jury what result to reach.  Dkt. No. 52 at 2.  In their motion, the defendants object to 30 statements or opinions contained in Cone's report.  *Id.* at 4–19.  Each objection features the same stock argument: "This is an improper legal conclusion, seeking to tell the jury what law governs an issue and what the law means.  It is not an opinion to help the factfinder understand the evidence or an issue in question."  *See, e.g.*, *id.* at 12–13.  Taken together, these objections effectively seek a blanket prohibition on Cone's testimony.

Michael assures the Court that "Mr. Cone's 'legal conclusions' will not be presented to the jury."  Dkt. No. 56 at 7.  He argues that there is no way to know at this point whether these purported "legal opinions" will "actually be offered at trial."  *Id.* at 8.  Besides, he says, nothing prevents experts from relying on legal authority in forming their opinions.  *Id.* In response to the defendants' 30 objections, Michael offers his own stock response: "This is

not a legal conclusion because it does not omit the supporting facts; it is based on Mr. Cone's analysis of the relevant sources as applied to his independent and objective review of the pleadings and other documents identified in his report." *See, e.g.*, *id.* at 13–14.

### ii.    It is premature to exclude Cone's expert testimony.

The Court denies the defendants' motion to exclude Cone's expert testimony as premature. "Courts have found that the presence of impermissible legal conclusions in an expert's report is not a sufficient basis to strike the entirety of his testimony, particularly where, as here, his report 'provides additional, potentially admissible opinion[s].'" *Am. Can! v. Arch Ins. Co.*, 597 F. Supp. 3d 1038, 1047 (N.D. Tex. 2022) (alteration in original) (quoting *Novedea Sys., Inc. v. Colaberry, Inc.*, No. 6:20-CV-180, 2021 WL 6618488, at *2 (E.D. Tex. Nov. 8, 2021) (Kernodle, J.)). For example, Cone is expected to testify that the Hylands' use of certain marks is likely to cause confusion with marks owned by Postar IP. *See* Dkt. No. 52 at 35–40. His opinions could be inadmissible to the extent they articulate a legal standard or tell the jury what result to reach. *See Owen*, 698 F.2d at 240. But it remains true that experts "may testify as to legal matters that involve questions of fact." *Waco Int'l, Inc. v. KHK Scaffolding Hou. Inc.*, 278 F.3d 523, 533 (5th Cir. 2002); *see Viacom Int'l v. IJR Cap. Invs., LLC*, 891 F.3d 178, 192 (5th Cir. 2018) ("Likelihood of confusion is a question of fact.").

"[T]he line between permissible and impermissible lines of questioning can be difficult to draw, particularly without the context of live testimony at trial." *Am. Can!*, 597 F. Supp. 3d at 1048 (quoting *Tajonera v. Black Elk Energy Offshore Operations, LLC*, Civ. A. No. 13-0366, 2016 WL 8274173, at *8 (E.D. La. May 26, 2016)). Because Michael represents that Cone's opinions will not be offered as legal conclusions (Dkt. No. 56 at 7–8,

21), and because the Court needs more trial context to determine whether specific testimony invades the province of the jury, the defendant's pretrial request for nearly wholesale exclusion puts the cart before the horse.

That said, the Court will not permit any testimony at trial that constitutes an improper legal conclusion. Cone may not, for example, "definitively state what law applies" by articulating what he views as the applicable legal tests under the Lanham Act and Texas common law. *Alt Platform, Inc. v. Beckett Collectibles, LLC*, No. 3:22-CV-2867, 2025 WL 790252, at *3 (N.D. Tex. Mar. 11, 2025). Nor may he opine that the defendants violated the law or offer legal conclusions as to any element of any claim. *Id.* To the extent Cone's opinions are framed in this manner at trial, they are inadmissible.

In sum, the Court needs more context to determine whether Cone's opinions will take the form of impermissible legal conclusions, if they are offered at all. The defendants are effectively asking for a blanket ban on Cone's testimony, yet his report offers potentially permissible opinions that do not necessarily constitute improper statements of law. Thus, the defendants' concerns are "better addressed" through a "contemporaneous objection at trial." *Am. Can!*, 597 F. Supp. 3d at 1048 (quoting *Novedea Sys., Inc.*, 2021 WL 6618488, at *2). The Court therefore denies the motion to exclude Cone's testimony.

## 4.    Conclusion

For these reasons, the Court grants in part and denies in part the defendants' motions for summary judgment (Dkt. Nos. 47; 49). Michael lacks statutory standing under Section 1114 of the Lanham Act, meaning he cannot pursue a claim for infringement of the Registered Marks. And because there is no dispute about who owns the Registered Marks, the Court grants partial summary judgment on Michael's claim for declaratory relief.

But there are still genuine issues of material fact for the remaining claims, requiring the denial of Michael's request for preliminary injunctive relief. Nor have the defendants conclusively established their statute of limitations defense at this stage. Lastly, because it is premature, the Court denies the Hyland defendants' motion to exclude the expert testimony of John M. Cone (Dkt. No. 51).

Michael's motion for leave to file a response to David and Gargoyle's supplemental brief in support of their summary-judgment motion (Dkt. No. 92) is denied.[14]

So ordered on January 20, 2026.

JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE

---

[14] After the Third Arbitration Award, the Court allowed the parties to supplement the summary-judgment record and their briefing on the motions. *See, e.g.*, Dkt. Nos. 84–91. Initially, the defendants only moved to supplement the summary-judgment record with additional evidence. *See* Dkt. Nos. 80; 81. Unlike Michael, they did not file supplemental briefs addressing the relevance of the Third Arbitration Award. *See* Dkt. Nos. 84; 86. In order to obtain full briefing on the Award, the Court gave the defendants another opportunity to file a supplemental brief in support of their motions for summary judgment. Dkt. No. 88 at 2. Only David and Gargoyle took the Court up on its offer. *See* Dkt. No. 91. Soon after those defendants filed their supplemental brief, Michael filed the pending motion for leave to file *another* response in opposition. Dkt. No. 92. The Court already accomplished its goal of securing both sides' briefing on the Third Arbitration Award. And "in motion practice for this district the movant is normally entitled to file the last pleading." *Gen. Motors Corp. v. Am. Ecology Env't Servs. Corp.*, No. 399-CV-2625, 2001 WL 1029519, at *1 n.2 (N.D. Tex. Aug. 30, 2001). The Court therefore denies Michael's pending motion and declines to docket his proposed response to David and Gargoyle's supplemental brief. *See* Dkt. No. 92-1.